Good morning, Your Honors. Elisa Suano-Peterson for Defendant and Appellant John Alexander. The issue in this case is whether Defendant Alexander's right to a speedy trial under the Sixth Amendment was violated due to the delay that occurred between his indictment and his arrest. Your Honors, although it is somewhat out of order, I would first like to clarify an issue regarding Defendant Alexander. There was a comment made by Mr. Alexander's trial attorney stating that Mr. Alexander was informed at the time he was arrested, which was in December 2006, that he would be prosecuted in the United States. This is highly unlikely because at the time that he was arrested, no decision had been made whether the case would be brought in the United States or not. In fact, AUSA Lindsay stated that Staff Sergeant LeBlanc from the Royal Mounted Police did not contact her until the late winter or spring of 2007. Actually, he contacted her after the arrest, but he referred the case to her in late winter or spring of 2007. When he came to present the case to the U.S. Attorney's Office in Los Angeles, this was after the March 2007 return hearing where the defendants were supposed to appear in Canada. Sergeant LeBlanc clearly stated that he did not give a copy of the indictment to the defendant, and it was highly unlikely that any of his staff had done so. At most, the defendant may have been informed that the matter might be prosecuted in the United States, but there was actually no decision in regards to that matter. Since there was such a long delay between the time that he was indicted and his ultimate arrest, a time of almost five years, the defendant could easily have been confused as to whether any charges would be brought against him or that they would actually charge him in the U.S. because he was a minor player in this conspiracy, and the U.S. could easily have decided it was not worth the trouble to prosecute him there. Can I ask you about prejudice? What's the prejudice you are asserting? What's your strongest argument on prejudice? Well, on prejudice, I would say that the government, and I'll explain why, but the government, they did not act in a reasonably diligent manner, so there was a presumption of prejudice, and just by the passage of time, three of the witnesses had died. You say the witnesses, the victims, right? I'm sorry, three potential witnesses. Three of the victims had died. How does that hurt your client? It seems like that would go against hurting your client. If three of the victims had passed away, unfortunately and regrettably, then that's three less counts of the many counts that were brought against him. Well, the victim's testimony is also important in regards to the amount of damages, and he could have had a chance to cross-examine them if he had wanted to in regards to whether they really had suffered these damages, but the main point is that— Well, they wouldn't have been able to make the proof, bring the—fulfill their burden of proof with respect to those victims. Again, I'm not sure how that hurts your client. Well, the main point is that there is a presumption of prejudice after one year, and the government was not reasonably diligent, and therefore the presumption of prejudice kicked in, and this was altogether almost five years. Kath, let me ask you about the presumption of prejudice in this case. As I understand it, your client asserted his rights and contested extradition in Canada. Is that correct? Yes, that's right, because once he knew he had been indicted, which he knew after he was arrested— Sure. He was asserting his rights, obviously, because he doesn't want to be extradited if there wasn't sufficient evidence. So if that's the case, if he's fighting extradition and that slows down the process, and he has every right to do that, how do you show prejudice about effectively a slow extradition when your client was asserting that he did not want to be extradited and was actually fighting extradition? Well, it was—actually, the time period in question is from the indictment to his ultimate arrest, not after his arrest. The extradition proceedings happened after— No, I don't know that that's true. I'm sorry. Because it's a speedy trial violation that you're talking about, and he, by exercising his right to challenge extradition, he contributed to 16 months of the delay. So as you know, the balancing test that we're looking at, prejudice is one of the factors, and so I'm just trying to figure out if he contributed to 16 months. And again, there is no question, and I think the government concedes that this was more delay than they would ordinarily like or that it was longer than normal, but I think they're arguing under the balancing test, after taking everything into account, there was no violation of the speedy trial. Well, I think there are cases that say that it's irrelevant, you know, when you're talking about the amount of delay between the indictment and the arrest, it's irrelevant what happens after that point. I mean, there are cases—I can't remember which cases, Doggett or some other cases that say that, it's irrelevant what the defendant did, you know, after he was arrested. Because the point was that they had to get the extradition papers in order before they arrested him on the U.S. charges. So once the extradition proceedings started, that's a whole other issue. It shouldn't be considered in terms of the amount of time that occurred between the indictment and the point where he was arrested. And, you know, after he was arrested, there were extradition proceedings. And the—what I would also like to bring to the Court's attention is that— Let me ask you, I mean, it seems like Canada's role in the extradition process accounted for much of the delay or a good part of the delay. So how—I guess I'm trying to figure out, what's your best argument for why we would hold the government here accountable for that? Or it seems to diminish a little bit the part of the U.S. government. Well, that actually—I mean, you know, there's a joint venture doctrine, but that's—I'm submitting on that. Yeah, okay. You know, that was discussed in the briefs. But basically, Canadian delay actually is relevant to the issue of prejudice. It's a separate issue as to who was responsible for the delay. For example, if there's a long delay before trial and witnesses die, that could prejudice the defendant. And you can't say that the government was responsible for the death of the witnesses. And yet, the fact that that occurred compounded the prejudice to the defendant. And in this case, the U.S. delayed the matter and Canada delayed the matter. And the U.S. delay, in association with Canadian delay—I mean, because there was also Canadian delay and U.S. delay, it prejudiced the defendant even more in terms of the amount of time that occurred. It increased the presumption of prejudice because there was almost a five-year delay. So it's important to the issue of prejudice, no matter who was responsible for a particular period of delay. And I also want to emphasize that it is the government that bears the burden of determining—explaining pre-trial delay. You know, you have one minute left. Would you like to save it for rebuttal? Yes, I would like to save it for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Carrie O'Neill on behalf of the United States. I'd like to address defendant's clearly unsupported joint venture argument, by which he seeks to conjure up an almost five-year post-indictment delay. The joint venture argument, quite quickly, Your Honors, fails both factually and legally. There's absolutely nothing in the record to show that the United States government, at its highest levels, was engaged in a joint venture with Justice Canada in terms of its extradition process. In fact, the record shows it was an incredibly painstaking and difficult process, and complaints were lodged at policy levels in general about the length of time it took Canada to process extraditions in general. Moreover, defendant just seemed to suggest that Canadian delay, even without the joint venture analysis, could somehow be imported into the federal constitutional speedy trial analysis, and I just don't see how that could be. It's a federal constitutional right, and federal action would have to trigger it. And opposing counsel has submitted on the joint venture doctrine, but I am curious, on this delay, I mean, it looks like, you know, you're arguing that the government diligently, or even when the foreign government, that the government here should not be held accountable for what the foreign government did. I mean, but, you know, I think here the foreign government, if you count up the months, it's like over 30, it's like 32, 36 months accountable to the Canadian government of the delay, right? Yes, 32.6. Let's say it had been eight years. Yes. You'd still stand on that? That's correct, Your Honor. If the United States government is not the one responsible for the delay, it's solely a result of the Canadian process, it seems impermissible to then import that Canadian delay into the federal constitutional analysis. It's a federal right born out of the United States of America. The Canadian delay does not come into it because the United States government didn't cause it. You know, presumably this court could figure, you know, at some point, 20 years down the line, that maybe that Canadian delay would have to be held against the United States government. But I would argue not even at that point because that would actually reward and incentivize these sorts of cross-border transactions. It has to be. What does that mean? Well, defendants operate outside the United States of America, so these defendants were in Canada. They were engaging in cross-border crimes into the United States, targeting elderly United States citizens. And so if they know they're in a regime that has a painstakingly slow extradition process, it actually rewards and incentivizes them to commit the crime across our border. We're going to have more crime if there's delay in extradition proceedings, is it? Well, it would make it harder, first of all, for the United States to prosecute it just because as— So if you want to go into the crime business, you ought to go to the border and commit some crimes in Canada and the United States. And that's a good way to go into the business of crime, right? Well, Your Honor, it kept this AUSA very busy. She testified that over the course of her career, she had done 20 to 40— Well, that's going to help their employment problem then. Well, what I'm suggesting is that— It incentivizes employment, hasn't it? I'm suggesting it's an actual problem. I'm not saying that these defendants knew specifically that Canadians' extradition process was slow. How about if you put another U.S. attorney on it and had two people working on it? That would be good for employment also. This isn't really a question of government employment. I think the record shows here in reference to that 9.6-month period of time, which is probably the most—the period of time we really should be looking at because the district court found that there were 26.4 months attributable to United States delay. 16.8, by my count, is dealing with the redrafting and the resending of the record of the case back and forth between the AUSA, OIA, and Justice Canada. There is a lot of testimony on the record that there was nothing unusual or atypical about that, and moreover, that the work product of the AUSA was in no way substandard, and that was testified to by both Director Olson, who was head of the Canadian OIA team, as well as Staff Sergeant LeBlanc of the Mounties. So if you want to focus your honors on the 9.6 period of time, which the district court held was still reflective of reasonable diligence, the AUSA was candid with the court. She showed candor and credibility with the district court, and the district court found her credible and, in fact, made a finding of reasonable diligence, which under Doggett, this court has to give considerable deference to, and I quote those terms. She testified the first two months she had a busy calendar. So after indictment the first two months, she did not immediately start working on the record of the case. She explained that there was no paralegal to assist her and that her FBI agent was not organized, and that's at ER 214 to 215. She explained she was not just cutting and pasting what she had prepared for the indictment. She had to send out her agent for additional supporting documentation and witness statements. That's at ER 218. She testified, in fact, that it was easier to convict a defendant at trial in the United States beyond a reasonable doubt than it was to get them extradited from Canada. That's ER 220. She testified that preparing this record of the case was akin to preparing for trial, ER 223. Moreover, I urge this court to remember that this was not one single extradition request. This was an extradition request for 22 defendants involving over 100 search warrants on computers, multiple wiretaps, surveillance, and transcripts. Counsel, I'm wondering, having worked in that office and worked in other U.S. attorneys' offices, is there any system in place to track, like a tickler system where after 90 days the international coordinator would check in with that AUSA and say, you know, where are we, or is it just up to the line AUSA to keep track of this? I don't know exactly. There is reference to a tickler system within OIA's own workings in reference to tickling Canada, getting Canada's attention. I actually help handle incoming extraditions for the office, not outgoing extraditions, and there is frequent contact between OIA and the AUSA. But it seems to me that if someone were on Ms. Lindsay's case, then we probably would have been 9.6 months. Maybe it would have been 3 months, maybe it would have been 6 months. But some of it was, frankly, as she admitted in her testimony, she just didn't get around to it. So I'm just wondering, when we're dealing with people's rights in other countries, are there processes if they're not in place yet, pretty simple process, spreadsheet, with a little whistle on your outlook to remind you 90 days, where are we on this thing? Is that going forward something that could happen? Oh, most definitely, Your Honor. And I assure you that there is communication, at least on my side of it, which is with incoming extraditions from foreign countries. There is a lot of follow-up and communication. But I would also remind the Court that if this were just a United States prosecution and it didn't have this cross-border element, the 9.6 months of delay here wouldn't even trigger the Barker analysis under Barker v. Wingo because it's not even a year.  That 9 months is not the only 9 months contributed to the government. I mean, the government here, I mean, the ASA totaled up more to 26 months. Well, that is correct. But I think what I'm trying to get to is out of that 26.4 months, I would urge this Court to find that at least the 16.8 that was the going back and forth, once the formal extradition requests have been submitted to OIA, it is then a very typical process that ensues. And the record supports that. And there's nothing to suggest that during that period of time there was anything but reasonable diligence. So then the question is, was there negligence? Should this Court find that the district court was wrong and that there was negligence with that 9.6-month period of time? Even if this Court determines that for some reason the AUSA was somehow negligent in not preparing the formal extradition request before those 9.6 months, the defendant still doesn't get to retain the presumption of prejudice throughout the Barker analysis. The Supreme Court made clear in Barker that the negligence presumption of prejudice question is analyzed on a spectrum. So if there is governmental negligence, the question of whether or not the presumption of prejudice remains through the tail end of the Barker analysis depends on the length of time of the delay. So that's why in cases like Shell and Mendoza, those are 5- and 8-year negligent delays, and the presumption of prejudice is deemed to apply. It's still a rebuttable presumption, but it's deemed to apply. But this Court in Bayman, Gregory, and Manning have clearly shown that the type of delay here, just over 2 years if you're looking at the 26.4, and under a year if you're looking at the 9.6, is not sufficient to remove from defendant his burden of showing actual prejudice. But you agree, I guess, don't you, that the defendant here, you know, has no ability to expedite extradition during this period, particularly if he's unaware of the indictment? If that were the case, but I quarrel with a couple of the underlying propositions there. First of all, you can always make yourself amenable to the United States jurisdiction by appearing, which 12 of his co-conspirators did. So what happened was they were arrested in Canada. Are you talking post-indictment? Post-indictment. So post-U.S. indictment, they are then arrested in Canada. And they had their property seized by the Canadians throughout the investigation. The United States requested that property through MLAT. So Staff Sergeant LeBlanc testified that they were repeatedly meeting with the arrestees and that Staff Sergeant LeBlanc repeatedly instructed his detectives working under him to tell these defendants that most likely there were going to be proceedings in the United States, that they should avail themselves of the United States, like bring themselves to the United States essentially, in part, and he testified, to speed up the extradition process. And 12, excuse me, 13 of the 21 other co-defendants knew of the American charges before their arrest and made themselves available. And I would argue that the circumstantial evidence here, coupled with that custom and practice that Staff Sergeant LeBlanc testified to, which under federal rule of evidence 406 is admissible as proof of the fact that it actually happened, this defendant most likely knew that this had been handed over to the United States and there was going to be an indictment. And then after there was the arrest, he was being informed that the property wasn't being returned because it was being sent to the United States. So did he know? Most likely. Thank you, Catherine. Thank you. Your Honors, I think it really needs to be emphasized that there was a delay of over a year and a half before the first draft of the indictment request was even submitted to the Canadian government. And it's clear that AUSA Lindsay had a tremendous amount of experience with indictments. She said she did 30 or 40 cross-border cases. She had worked extensively with the OIA in Washington. And in regards to extradition requests, she had a tremendous amount of experience. And yet she said she really didn't have a good excuse for the 9.6 months of delay just to get it to the OIA  And then Olson, who also has tremendous experience having handled hundreds of extradition requests, he took four months to review her work and then she took another four months just to work on the initial draft. So it was a year and a half before the Canadians even received it. And both Olson and Lindsay knew that the Canadians were picky and this could be a lengthy process. So there really is no excuse to spend a year and a half just to get the initial draft to them. And even after that point, each time the request came back, it took one to three months for them to do the revisions. And it's not just a matter of the amount of time, but it's whether this could have been prevented. And actually it seems that they could have certainly put the first draft in much more expediously. And in regards to prejudice, it was actually almost five years. And the longer the time that the defendant is left pending, there was, I mentioned in the brief, that he was suffering emotional distress or he was stressed because he didn't know what was going to happen to him. And cases do go stale at that point. So there was a strong presumption of prejudice. Thank you, Counsel. You're welcome.
judges: Reinhardt, Murguia, Owens